UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| CLARENCE ADIE HARVEY,<br><br>            Petitioner,<br><br>    vs.<br><br>ERIC ARNOLD, Acting Warden,[1]<br><br>         Respondent. | Case No:  C 11-06232 SBA (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

Petitioner Clarence Adie Harvey ("Petitioner") brings the instant pro se habeas action under 28 U.S.C. § 2254 to challenge his 2009 state conviction and sentence for second degree robbery.  Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby DENIES the Petition for the reasons set forth below.

---

[1] Eric Arnold, the current acting warden of the prison where Petitioner is incarcerated, has been substituted as Respondent pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I.      BACKGROUND

## A.      STATEMENT OF FACTS

The following facts are taken from the opinion of the California Court of Appeal ("Court of Appeal" or "state appellate court"):

> I.      *Prosecution Evidence*
>
> A.      *The Rented Dodge Avenger*
>
> Lacrecia Simms rented a silver gray Dodge Avenger from Enterprise Rent-A-Car on April 18, 2008.  She loaned the car to her sister, Venecia Simms.  Defendant is the father of one or more of Venecia's children.
>
> On Sunday, April 20, Venecia dropped the Dodge off at a community car wash in East Palo Alto and arranged to have the car picked up later by Anthony Pratt, a friend of hers and defendant's and the godfather of one of defendant's children.  She told Pratt that she would call him about getting the car back later that day.  Before that time, neither Pratt nor defendant had ridden in the car.  Venecia called Pratt later on.  "He said that he was handling some business and he would call [her] back . . . ."  Venecia tried unsuccessfully to reach Pratt the next day.  She never saw the Dodge again.
>
> B.      *The Mountain View Robbery*
>
> Maria Sousa (Sousa) and her husband have owned Sousa's Wines & Liquors on Moffett Boulevard in Mountain View since 1998.  (In or about 2004, Venecia lived on Tyrella Avenue in Mountain View—which is near Sousa's Wines and Liquors—and defendant visited her there.)  At about 12:15 p.m. on April 21, Sousa was working in the back of the store when a man carrying a gun and wearing a hooded black jacket and a ski mask entered the store.  He approached her and said, "'Give me the money.'"  Sousa said the money was in front, and he directed her to get it.  She stepped in front of him and went to the cash register.  The man was behind her and had the gun in her back.  Sousa gave him the money in the register.  There was a safe below the register that contained the cash from the previous weekend's transactions, and the man directed her to open it.  Sousa bent down to open the safe and passed the money to the man, who continued to stand behind, pointing a gun at her.  He told her to keep her head down.  Sousa thought at the time that the man was going to shoot her.  She estimated that there was about $2,000 in the register and $4,000 in the safe.
>
> The man's face was entirely covered by a mask, but Sousa noticed that the skin around his eyes was darker than hers.  (Sousa described herself as "dark Portuguese.")  He spoke English without an accent, and Sousa estimated that he was

between 18 and 30 years old.  While Sousa was opening the safe for the masked robber, she saw that he was wearing Nike tennis shoes that were "grayish with a swoosh of blue."  During trial, after standing next to defendant, Sousa testified that the man who robbed the liquor store was the same height and had the same skin tone as defendant.  She also testified that the robber was approximately five feet 10 inches tall, the same height as her husband.

The liquor store had a new, nine-camera video surveillance system that operated 24 hours a day.  The system had the capability of capturing still photographs as well.  The video surveillance system captured the robbery as it progressed, beginning with an image of the man outside the store.  As he entered the store, the system showed him reaching into the right side of his waistband and pulling out a gun.

C.     *The Campbell Robbery*

Stanley Ungson is the co-owner of the U-Save Liquor Store on Hamilton Avenue in Campbell.  He was working there on April 21.  At about 1:23 p.m., a man with a gun entered the liquor store.  He was African American, approximately five feet 11 inches to six feet tall, weighed about 210 to 215 pounds, and wore a ski mask and a black hooded sweatshirt.  He approached the check-out stand and demanded of Ungson: "'Give me all your money.  Don't mess around.'"  Ungson gave the man all the money in the register.  The man then asked if there was money in the drawer next to the cash register, and Ungson gave the man the small amount of cash in the drawer.

As the man was leaving the store, he bumped into one of the doors; Ungson heard a gunshot, and then heard the man say, "'Oh, shit.'"  After the man left, Ungson locked the front door and called the police.  Ungson testified that defendant's skin tone and height were the same as the person who had committed the robbery.  Ungson thought defendant's build at the time of trial looked "[a] little slimmer" than the robber, but the robber's sweatshirt "was a little baggy."

A neighbor, Michael Broback, heard a loud bang while he was in his backyard.  He went to the front and saw an African American male, who was wearing dark clothing, "running peg-legged [with both legs straight] across the street."  He dropped something metallic that clattered on the street and picked it up.

D.     *Defendant's Hospital Visit*

At approximately 1:30 p.m. on April 21, George Skucius was at the emergency room of Kaiser Hospital in Santa Clara where he worked when a red Camaro with two African American males drove up quickly into the ambulance bay.  The driver said that his friend had been shot.  Skucius asked the passenger to describe where he had been shot, and he responded that he did not know.  When he loaded the man onto a gurney,

he saw that "there was blood all over the back side of his pants." After bringing him inside, the hospital emergency room staff removed the patient's clothing, which was then given to the police. The bag containing the clothes did not contain any shoes, although there were socks in the bag. Dr. Michelle Holmes, the emergency room treating physician, determined that the patient, defendant, had a wound on his right thigh (a hole with an entrance and exit), an abrasion on his right testicle, and a puncture wound in his left thigh. A bullet was found lodged in his left thigh. She concluded that it was likely he had been wounded by one shot.

Between 2:00 p.m. and 3:00 p.m., Skucius went outside to his truck parked in the employee lot. Parked next to him was the same red Camaro he had seen earlier drive into the emergency bay; there was a pair of tennis shoes that did not belong to him in the bed of his truck. Skucius went back inside and told police officers about the shoes, and they went outside and took custody of them.

The police also obtained permission from Pratt to search his red Camaro. Located inside the car was a black hooded sweatshirt, and the key to the rented silver Dodge Avenger.

E.    *Post-Robbery Investigation*

Detective Cary Shueh of the Mountain View Police Department was assigned to investigate the Mountain View robbery. Sousa told him that she might be able to recognize the robber's shoes. Detective Shueh obtained from the Campbell police department the tennis shoes that had been retrieved from Skucius's truck and photographed them. He also took photographs of five pairs of Nike tennis shoes from a Mountain View shoe store. About a week after the robbery, he showed Sousa the photographs of the six pairs of tennis shoes. She indicated that the photograph depicting the shoes retrieved from Skucius's truck looked similar to the ones worn by the robber.

Those tennis shoes were tested by a criminalist, who determined that defendant was the major source of the DNA found on the tag on the interior tongue of the left shoe. In addition, the sleeves of the hooded sweatshirt retrieved from Pratt's car were swabbed and tested. The sample from the left sleeve yielded "one consistent particle of gunshot residue," and the sample from the right sleeve had "a few characteristic particles of gunshot residue."

The check-cashing business next door to the Campbell U-Save Liquor Store had a video surveillance system. An expert on Dodge vehicles testified that there was a Dodge Avenger depicted in the video taken at the time of the robbery. The same expert opined, after looking at video and several still photographs extracted from the video surveillance system at Sousa's Wines and Liquors on April 21 at the time of the robbery, that a silver Dodge Avenger was also depicted in those photographs and was circling the parking lot before the robbery.

1
2
3
4
5
6
7
8
9

Sometime after the robberies occurred on April 21, the police determined that the Dodge Avenger had been parked in a space at an apartment complex in San Jose; the space had been assigned to Alisha Farmer, Pratt's girlfriend.  Before its whereabouts were discovered by the police, the car was towed to the home of Patrick Cooper, the tow truck driver, who had been instructed to clean it.  The front passenger seat had a brown stain that Cooper, after repeated cleaning efforts, was able to clean.  About a week later, Cooper's boss had the Dodge towed to a lot in San Jose.  When the car was ultimately located by the police, the lead investigator for the Campbell robbery determined that the keys recovered from Pratt's Camaro belonged to the Dodge.  A criminalist ripped the front passenger seat and determined that the seat appeared to be stained with blood.  He determined from DNA testing that the traces of blood found in the seat cushion were a match to defendant's DNA.

10
11
12
13

Pursuant to a search warrant, the police obtained the call records for defendant's cellular phone from the provider, Metro PCS.  On the day of the robberies, April 21, there was a record of 30 calls involving defendant's cell phone between 11:48 a.m. and 1:37 p.m.  There were no connected calls that occurred with defendant's cell phone during the times that the Mountain View or Campbell robberies transpired.

14

II.    *Pertinent Defense Evidence*

15
16
17
18
19

Around noon or 1:00 p.m. on April 21, Marvella Millan, a clerk at the hotel next door to Sousa's Wines and Liquors, encountered an African American male who "kind of looked suspicious."  He came to the front desk inquiring about a room. He and Millan never made eye contact when they spoke, and after asking some questions, he left the hotel.  She described the man as about five feet six inches tall, and wearing a black hooded sweater.

20
21
22
23
24

Another hotel employee, Patricia Demeza, saw an African American man on April 21 shortly before the time she heard there had been a robbery.  He was on the other side of the wall between the hotel and the liquor store walking toward the store entrance.  She did not see him go into the liquor store. The man wore a hooded sweatshirt and was about five feet six inches tall.  Demeza also testified that at that time, there was a trailer behind the liquor store where several Hispanic and African American people would loiter, occasionally drink, and periodically go into the liquor store.

25
26
27

Detective Shueh arranged a photo lineup that included the photographs of six men, including defendant.  Neither Millan nor Demeza was able to identify the man seen at or outside the hotel.

28

People v. Harvey, 2011 WL 2039701, *1-4 (Cal. Ct. App. May 25, 2011) (footnote omitted).

**B.   CASE HISTORY**

**1.   Conviction and Sentencing**

Petitioner's case was tried before a jury in the Santa Clara County Superior Court. On November 2, 2009, a jury convicted him of two counts of second degree robbery based on the two liquor store robberies that occurred on April 21, 2008. Dkt. 7, Ex. A, Clerk's Transcript ("CT") 448. The jury also found true the allegations that Petitioner used a handgun in committing both offenses. Harvey, 2011 WL 2039701, *4. Petitioner admitted the remaining allegations that he had been released from custody on bail in connection with another offense at the time of the incidents, and that he had previously been convicted of two felonies for which he had served prison terms. Id. On February 9, 2010, the court imposed a sentence of eighteen years and four months.

**2.   Appeals**

Petitioner appealed the judgment to the Court of Appeal. Specifically, he challenged the adequacy of the trial court's response to a jury question, the admissibility of the shoe lineup, the adequacy of the jury instructions, and the accuracy of parole revocation and restitution fine calculations. Dkt. 7, Ex. F. In an unpublished opinion, filed on May 25, 2011, the state appellate court affirmed the judgment. However, the court found meritorious Petitioner's claim that the fines were erroneously calculated and modified them accordingly. Harvey, 2011 WL 2039701, *1.

On June 27, 2011, Petitioner filed a petition for review with the California Supreme Court, raising all his claims on direct appeal, except for the claim regarding the erroneous fine calculation. Dkt. 7, Ex. J. The California Supreme Court denied the petition for review on August 10, 2011. Id.

**3.   Federal Court Proceedings**

On December 13, 2011, Petitioner filed the instant Petition, which alleged the claims raised in his petition for review. Dkt. 1. On February 15, 2012, the Court issued an Order

to Show Cause why the writ should not be granted.[2]  Dkt. 6.  Respondent has answered the Petition, and Petitioner has filed a Traverse.  Dkts. 7, 8.  The matter is fully briefed and ripe for adjudication.

## II.      LEGAL STANDARD

The instant Petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.  Under AEDPA, a federal court cannot grant habeas relief with respect to any claim adjudicated on the merits in a state-court proceeding unless the proceeding "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

A state court decision is "contrary to" clearly established federal law "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases or if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent."  Lockyer v. Andrade, 538 U.S. 63, 73 (2003) (internal quotation marks omitted).

Relief under the "unreasonable application" clause is appropriate "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id.  Habeas petitioners bear the burden of showing that a state court's decision applied some Supreme Court precedent in an objectively unreasonable manner.  Woodford v. Visciotti, 537 U.S. 19, 25 (2002) (per curiam).

---

[2] In an Order dated January 19, 2012, the Court had dismissed this action without prejudice based on Petitioner's failure to provide the proper forms in support of his in forma pauperis application.  Dkt. 4.  However, in its February 15, 2012 Order to Show Cause, the Court vacated the January 19, 2012 dismissal and reopened the case, explaining that the missing forms had actually been submitted on January 13, 2012, but they were not entered into the Court's electronic database until January 31, 2012—six days after the dismissal order was issued.  Dkt. 6.

In determining whether a state court's decision is contrary to, or involves an unreasonable application of, clearly established federal law, courts in this Circuit look to the decision of the highest state court to address the merits of the petitioner's claim in a reasoned decision.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-804 (1991); LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000).  Moreover, "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

On federal habeas review, AEDPA "imposes a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt."  Renico v. Lett, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). In applying the above standards on habeas review, this Court reviews the "last reasoned decision" by the state court.  See Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). The last reasoned decision in this case is the Court of Appeal's unpublished disposition issued on May 25, 2011.

## III.   **DISCUSSION**

Petitioner asserts the following claims:  (1) the trial court provided an inadequate response to a jury question regarding CALCRIM No. 224 (instruction concerning circumstantial evidence), causing the jury to misapply the law; (2) the trial court gave improper instruction on consciousness of guilt, CALCRIM No. 371, which directed the jury towards an inaccurate conclusion; and (3) the trial court erred in admitting the "suggestive" shoe lineup.  Dkt. 1 at 6-10.[3]

//

//

//

//

---

[3] Page number citations refer to those assigned by the Court's electronic case management filing system and not those assigned by Petitioner.

8

## A.   RESPONSE TO JURY QUESTION

### 1.   Background

At trial, the court read CALCRIM No. 224, a circumstantial evidence instruction that states as follows:

> Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.  [¶]  Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty.  If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence.  However, when considering circumstantial evidence, you must accept only [the] reasonable conclusions and reject any that are unreasonable.

Harvey, 2011 WL 2039701, *6 (quoting CALCRIM No. 224) (footnote and brackets in original); CT 413.   This instruction must be given where "the prosecution substantially relies on circumstantial evidence to establish any element of the case."  Id. (quoting People v. Samaniego, 172 Cal.App.4th 1148, 1171 (2009)).  In addition, CALCRIM No. 224 "does not concern the burden of proof" or "define reasonable doubt," but instead relates to "the threshold inquiry regarding the use of circumstantial evidence" and "to caution the jury before relying on circumstantial evidence to find the defendant guilty beyond a reasonable doubt."  Id. (citations omitted).

During deliberations, the jury sent the following question to the trial court: "Per CALCRIM [No.] 224 (pg.7), if 1 part of circumstantial evidence is *unclear*, can we disregard that piece of evidence and weigh the remaining pieces of evidence to come to a verdict?"  CT 437 (emphasis added).  The Court of Appeal summarized the facts regarding how the trial court responded to this jury question as follows:

> The court met with counsel and discussed a response to the jury's question.  The court prepared the response based upon that discussion, and it was delivered, without objection by either counsel, to the jury.  The response read: "Yes, if by unclear you are referring to the first paragraph of CALCRIM [No.] 224: Lines 3-5 on page 7 of the instructions.  [¶]  [*The Court is*

1
2
3
4
5

> *assuming your question refers to the first paragraph only and not the second paragraph of CALCRIM [No.] 224.* [¶] That paragraph states: [¶] ['] Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt.' [¶] If I have not answered your question or misunderstood your question, please let me know and re-ask your question." (Original italics.)

6  Harvey, 2011 WL 2039701, *5 (brackets added). The jury did not ask any follow-up

7  questions.

8        In his Petition, Petitioner contends that the trial court committed prejudicial error by

9  instructing the jury that under CALCRIM No. 224, it could disregard circumstantial

10  evidence that it deemed "unclear." Dkt. 8 at 12. Petitioner argues that the trial court's

11  response conflicts with California Penal Code § 1096, which requires that a jury "apply the

12  beyond a reasonable doubt standard to **all** the evidence." Id. (emphasis in original).

13  Petitioner asserts: "If the evidence is unclear[,] i.e., the People have not proved each fact

14  essential to that conclusion beyond a reasonable doubt. Moreover disregarding some

15  evidence and considering other evidence abrogates the jury's sworn duties." Id. at 13. The

16  Court of Appeal construed Petitioner's argument as one that the jury instruction

17  "improperly allowed [the jury] to view the People's case as being stronger than it actually

18  was since the persuasive portion of the segregated evidence was segregated from the

19  unpersuasive portion of the People's case." Harvey, 2011 WL 2039701, *6.

20        Petitioner acknowledges that defense counsel, Andrea Ambrosio, Esq., "waived any

21  objection to the [trial] court's answer to the jury." Dkt. 8 at 11. The state appellate court

22  addressed this claim in connection with Petitioner's direct appeal, and initially found that

23  because defense counsel did not object to the court's response, she forfeited the issue on

24  appeal. Harvey, 2011 WL 2039701, *5 (citing People v. Hamilton, 45 Cal. 4th 863, 949-50

25  (2009) (challenge to court's response to jury question concerning meaning of "lingering

26  doubt" forfeited where defense counsel agreed to language)). Nonetheless, the state

27  appellate court also considered and rejected this claim on the merits. Id., *5-7.

28

The state appellate court found that Petitioner's argument—that the court's response advised the jury that it should not consider all of the evidence presented in assessing whether the prosecution proved his guilt beyond a reasonable doubt—ignored the fact that the jury received CALCRIM No. 220.  CALCRIM No. 220 reads, in part:

> In deciding whether the People have proved their case beyond a reasonable doubt, *you must impartially compare and consider all the evidence that was received throughout the entire trial.* Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty.

Id., *7 (quoting CALCRIM No. 220) (emphasis added).  The state appellate court noted that the jury was advised, pursuant to CALCRIM No. 200, that it should "[p]ay careful attention to all of these instructions and consider them together."  Id. (quoting CALCRIM No. 200).  In rejecting Petitioner's claim and finding the court's response to be adequate, the court explained as follows:

> Here, the jury was properly instructed that it was required to "impartially compare and consider all the evidence that was received throughout the entire trial."  Were we to assume the jury interpreted the court's answer to the question regarding CALCRIM No. 224 in the manner urged by defendant—namely, that it could discard certain evidence entirely and thereby ignore its obligation under section 1096 to compare and consider all the evidence to decide whether the prosecution had proved defendant's guilt beyond a reasonable doubt—we would infer that it had ignored the instruction given under CALCRIM No. 220.  We shall presume the jury obeyed the court's instructions.  (People v. Jones (2011) 51 Cal. 4th 346, 371 [jury presumed to have followed court's instructions concerning proper purpose for which it could consider evidence]; see also People v. Lewis (2001) 26 Cal. 4th 334, 390 [jurors presumed intelligent and "'capable of understanding' [']and correlating jury instructions'"].)
>
> Based upon all of the circumstances, including consideration of the instructions in their entirety, we find that it is not reasonably likely that the jury interpreted and applied the court's answer to the CALCRIM No. 224 question in the improper manner claimed by defendant.

Id., *7.

**2.     Analysis**

Whenever a jury "makes explicit its difficulties a trial judge should clear them away with concrete accuracy." Bollenbach v. United States, 326 U.S. 607, 612-13 (1946).  The trial judge has a duty to respond to the jury's request for clarification with sufficient specificity to eliminate the jury's confusion.  See Beardslee v. Woodford, 358 F.3d 560, 574-75 (9th Cir. 2004).  The formulation of the response to a jury's question is a stage at which defense counsel can make a valuable contribution.  See Musladin v. Lamarque, 555 F.3d 830, 839-41 (9th Cir. 2009) (discussing importance of defense counsel's participation in the formulation of a response to a jury question).

When a trial judge responds to a jury question by directing its attention to the precise paragraph of the constitutionally adequate instruction that answers its inquiry, and the jury asks no follow up question, a reviewing court may "presume[] that the jury fully understood the judge's answer and appropriately applied the jury instruction." Waddington v. Sarausad, 555 U.S. 179, 196 (2009).  The trial judge has wide discretion in charging the jury, a discretion which carries over to the judge's response to a question from the jury. Arizona v. Johnson, 351 F.3d 988, 994 (9th Cir. 2003).  And just as a jury is presumed to follow its instructions, it is presumed to understand a judge's answer to a question. Weeks v. Angelone, 528 U.S. 225, 234 (2000).

To obtain habeas relief following an allegedly erroneous response to a jury question, a petitioner must show constitutional error resulted and that the error was not harmless. Morris v. Woodford, 273 F.3d 826, 833 (9th Cir. 2001).  In evaluating the instructions, the "reviewing court must determine 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.'" Johnson v. Texas, 509 U.S. 350, 367-68 (1993) (quoting Boyde v. California, 494 U.S. 370 (1990)).  "That inquiry also can be described as having two parts: (1) whether there is a reasonable likelihood that the jury understood an assertedly ambiguous instruction to mean what the defendant suggests it means; and (2) if so, 'whether the instruction, so understood, was unconstitutional as applied to the

1   defendant.'" Morris v. Woodford, 273 F.3d 826, 833 (9th Cir. 2001) (quoting in part

2   Calderon v. Coleman, 525 U.S. 141, 146 (1998)).

3        Here, Petitioner has failed to demonstrate that the trial court's response to the jury

4   question infringed upon his constitutional rights. As an initial matter, the Court is bound by

5   the Court of Appeal's determination that the trial court gave an "adequate" response to the

6   jury's question, which must be accepted on federal habeas review. See Hicks v. Feiock,

7   485 U.S. 624, 629-30 (1988) (federal court must accept state court's interpretation of state

8   law). In any event, no constitutional error resulted, since the jury was not reasonably likely

9   to interpret the court's response in the manner that Petitioner claims *when viewed in the*

10  *context of the overall charge.* See United States v. Harrison, 34 F.3d 886, 889 (9th Cir.

11  1994) (A single instruction to a jury may not be judged in artificial isolation, but must be

12  viewed in the context of the overall charge.). As noted, CALCRIM 220 instructed jurors to

13  "consider all the evidence that was received throughout the entire trial," while CALCRIM

14  200 instructed that all instructions must be considered together.

15       Even if constitutional error had occurred, such error was harmless because the

16  evidence of Petitioner's guilt was overwhelming. The prosecution presented evidence that

17  Petitioner matched the victim's unimpeached description of the robber of the second liquor

18  store. Dkt. 7, Ex. B, Reporter's Transcript ("RT") 570-571, 809. The prosecution also

19  presented testimony from the victim and an onlooker which established that the robber

20  accidentally shot himself as he left the store. RT 562-563, 587, 596. Shortly after the

21  second robbery, Petitioner arrived at the hospital suffering from a gunshot wound that was

22  fully consistent with the kind of wound the robber would have suffered by accidentally

23  shooting himself. RT 719-724. Gunshot residue was on the sleeves of the sweatshirt that

24  the police found in the car where Petitioner had been sitting when he was driven to the

25  hospital. RT 662, 912-913, 924-927.

26       Also compelling is the fact that a Dodge Avenger was near both liquor stores just

27  before the robberies. The same type of car was closely linked to Petitioner's friends during

28  the relevant time-period and Petitioner's blood was found to be where the robber's blood

would have been if the Avenger was the getaway car.  RT 461-465, 475-476, 639, 662, 768, 770, 775, 840-844.  Petitioner's cell phone use corroborated that he was near both liquor stores when they were robbed, and showed that he was *not* using his phone at exactly the time of the robberies.  RT 558, 695-696, 880-885.  Finally, while Petitioner presented defense witnesses to testify that shortly before the first robbery they saw someone who could be the perpetrator, such testimony ultimately did not rebut the prosecution's evidence that Petitioner matched the victim's trial testimony relating to the description of the robber of the first liquor store.  RT 526, 543, 809, 936-940, 948-951.

Accordingly, the Court of Appeal's denial of this claim was not objectively unreasonable.  Therefore, Petitioner is not entitled to habeas relief for his claim relating to the trial court's allegedly inadequate response to a jury question.

## B.   INSTRUCTIONAL ERROR

### 1.   Background

Petitioner contends that the trial court violated his due process rights when it incorrectly instructed the jury with CALCRIM No. 371, the consciousness of guilt instruction.  During its conference with counsel regarding jury instructions, the trial court stated its intention to give a modified version of CALCRIM No. 371 regarding using the concealment of evidence as indicative of a consciousness of guilt.  Harvey, 2011 WL 2039701, *10.  The prosecutor argued that Petitioner had "manifested a consciousness of guilt" by:  (1) concealing the Dodge Avenger before going to the hospital; and (2) having Anthony Pratt to discard his shoes.  Dkt. 8 at 16; RT 993-994, 1009-1011.  The court then stated its intent to instruct the jury on consciousness of guilt pursuant to a modified version of CALCRIM No. 371, which was based upon "<Alternative C-fabrication or suppression by a third party>" of CALCRIM No. 371.  RT 993, 1012-1013.

Defense counsel objected to the instruction on the ground that there was no evidence to support that Petitioner, through a third party, suppressed evidence.  In particular, she argued that there was no evidence that Petitioner was a passenger in the Dodge Avenger

1    rental car that the prosecution claimed was hidden after the robberies.  RT 993.  The court

2    overruled the objection and gave the following instruction:

> If someone other than the defendant tried to conceal or destroy
> evidence, that conduct may show the defendant was aware of
> his guilt, but only if the defendant was present and knew about
> the conduct, or, if not present, authorized the other person's
> actions.  It is up to you to decide the meaning and importance of
> this evidence.  However, evidence of such conduct cannot prove
> guilt by itself.

7    RT 994, 1012; CT 427.

8        Petitioner argues that the trial court committed prejudicial error by giving the

9    consciousness of guilt instruction.  Dkt. 8 at 20.  As he did on direct appeal, Petitioner now

10   argues that the instruction misstated the law insofar as it permitted the jury to find his

11   consciousness of guilt "merely because he was present when a third party disposed of

12   evidence."  Id. at 17; Harvey, 2011 WL 2039701, *10.  Moreover, Petitioner argues that the

13   instruction should not have been given because there was no evidentiary support that he

14   authorized Pratt to conceal the Dodge Avenger or discard his shoes.  Id. at 17.

15           **2.    Analysis**

16       A challenge to a jury instruction solely as an error under state law does not state a

17   claim cognizable in federal habeas corpus proceedings.  See Estelle v. McGuire, 502 U.S.

18   62, 71-72 (1991).  To obtain federal habeas relief for error in the jury charge, Petitioner

19   also must show actual prejudice from the error, i.e., that the error had a substantial and

20   injurious effect or influence in determining the jury's verdict.  See Coleman, 525 U.S. at

21   146 (citing Brecht, 507 U.S. at 637).  The error may not be judged in artificial isolation, but

22   must be considered in the context of the instructions as a whole and the trial record.  See

23   Estelle, 502 U.S. at 72.

24       In determining whether an allegedly erroneous instruction violated Petitioner's right

25   to due process, the Court first considers whether the instruction creates a mandatory

26   presumption or a permissive inference.  See United States v. Warren, 25 F.3d 890, 897 (9th

27   Cir. 1994) (analyzing whether jury instruction shifted burden of proof by determining

28   whether inference permissive or mandatory).  "A mandatory presumption instruction tells

the jury that it must presume that an element of a crime has been proven if the government proves certain predicate facts." Id.  In contrast, "a permissive inference instruction allows, but does not require, a jury to infer a specified conclusion if the government proves certain predicate facts." Id.  An instruction that creates a permissive inference does not shift the burden of proof or relieve the state of its burden of persuasion, as "it still requires the State to convince the jury that the suggested conclusion should be inferred based on the predicate facts proved." Francis v. Franklin, 471 U.S. 307, 314 (1985).

A permissive inference does not violate due process if can be said "'with substantial assurance'" that the inferred fact is "'more likely than not to flow from the proved fact on which it is made to depend.'" County Court of Ulster County v. Allen, 442 U.S. 140, 167 & n.28 (1979) (quoting Leary v. United States, 395 U.S. 6, 36 (1969)).  Courts "determine the constitutionality of a permissive inference instruction on a case-by-case basis" by reviewing the record evidence to see if the court can say with substantial assurance that the inferred fact flows more probably than not from the facts proven in the particular case.  See Warren, 25 F.3d at 898; see, e.g., Ulster County, 442 U.S. at 162-67 (finding instruction constitutional only after concluding that inference more probably than not flowed from specific facts proven to jury at trial).

Here, the record does not support Petitioner's claim that the challenged instruction denied him due process of law.  First, the state appellate court recognized that California courts have held that CALCRIM No. 371 creates a constitutionally valid *permissive* inference, stating:

> [T]he high court recently recognized that CALCRIM No. 371 correctly states the law: "Consciousness of guilt may be shown by (1) a defendant's own efforts to create false evidence or obtain false testimony, or (2) the efforts of someone else to do so, 'but only if the defendant was present and knew about that conduct, or, if not present, authorized the other person's actions.'  (CALCRIM No. 371.)"  (People v. Nelson (2011) 51 Cal. 4th 198, 214, fn. 9.)

> [S]uch an inference of consciousness of guilt in the case of a third party attempting to conceal or destroy evidence in the defendant's presence is not irrational.  A person's omissions may be just as revealing as his or her actions.  Where a

1   defendant stands by while another conceals or destroys
2   evidence unfavorable to the former, this inaction may show a
    consciousness of guilt on the part of the defendant.  We note
3   further that such an inference under CALCRIM No. 371 is not
    mandatory; it is only permissive.  And the giving of the
4   instruction was therefore "beneficial to defendant, to the extent
    that it made clear the [effort to suppress evidence] did not, in
5   itself, suffice to establish his guilt."  (People v. Johnson (1992)
    3 Cal. 4th 1183, 1235 [addressing CALJIC No. 2.06,
6   predecessor to CALCRIM No. 371].)

6   Harvey, 2011 WL 2039701, *11.  The state appellate court further explained that

7   CALCRIM No. 371 requires that evidence must be found to support the permissive

8   inference, stating as follows:

9           It is, of course, "an elementary principle of law that before a
10          jury can be instructed that it may draw a particular inference,
            evidence must appear in the record which, if believed by the
11          jury, will support the suggested inference. [Citation.]"
            ([People v.] Hannon . . . [(1977)] 19 Cal. 3d [588] at p. 597.)  A
12          consciousness of guilt instruction such as CALCRIM No. 371 is
            proper where there is "some evidence in the record that, if
            believed by the jury, would sufficiently support the suggested
13          inference."  (People v. Coffman and Marlow (2004) 34 Cal. 4th
14          1, 102.)  The determination of whether such evidence exists to
            support the jury's inference, thus rendering the instruction
15          proper, is one of law for the trial court to decide.  (Hannon, at
            pp. 597-598.)

16  Id., *12.

17          Second, the state appellate court pointed out that "[h]ere, contrary to defendant's

18  claim, some evidence was available from which the jury could have inferred that

19  [Petitioner] *participated in the suppression of evidence*."  Id. at *13 (emphasis added).

20  Thus, the appellate court reasonably found that the permissive inference did not violate due

21  process because the inferred fact, i.e. Petitioner's consciousness of guilt, was "more likely

22  than not to flow from the proved fact on which it is made to depend."  Ulster County, 442

23  U.S. at 167 & n.28.  Specifically, the state appellate court pointed to the following facts

24  proven to jury at trial showing that Petitioner either suppressed evidence himself or

25  authorized another person's destruction of evidence:

26          The prosecution argued, based on the video surveillance
27          evidence showing a Dodge Avenger at both liquor stores at the
            times of the respective robberies, that the rented Dodge was
            used in the commission of both crimes.  The evidence was
28          uncontroverted that Petitioner's blood was present in the

1  
2  
3  
4  
5  
6  
7  
8  
9

Dodge's passenger seat, supporting the conclusion that it was used in the Campbell robbery. And it was also undisputed that defendant arrived at the hospital in Pratt's Camaro. Since a person who is shot would ordinarily seek the fastest means of obtaining medical attention, the record supported an inference that defendant decided to switch cars in order to hide the Dodge used to commit the robberies. And as to the Nike shoes, the evidence was undisputed that defendant arrived at the emergency room in socks but without shoes. Shortly after dropping defendant off at the emergency room, Pratt apparently discarded the tennis shoes in a neighboring truck in the hospital parking lot. Defendant's DNA was present on the shoes, and there is no ready explanation why Pratt would, without permission, discard his friend's shoes. The jury could have reasonably concluded—contrary to defendant's claim that such a conclusion would constitute mere speculation—that defendant authorized Pratt to dispose of the shoes to avoid detection.

10    Id.

11    Finally, the state appellate court found that even if no evidence showed the scenario

12  contemplated by the instruction to have existed, the instruction would have been mere

13  surplusage. Therefore, the court determined that any theoretical error would have been

14  harmless. Specifically, the court concluded that "it was not 'reasonably likely that the trial

15  court's instructions caused the jury to misapply the law.'" Id., *12.

16    In the instant habeas action, the Court is not persuaded that the challenged

17  instruction by itself "so infected the entire trial that the resulting conviction violates due

18  process." Estelle, 502 U.S. at 72. As noted, jury instructions must be considered by a

19  federal habeas court in their entirety, not in isolation. Cupp v. Naughten, 414 U.S. 141, 147

20  (1973). Here, the trial court gave CALCRIM No. 200, which stated that not all instructions

21  may apply, that the jurors were not to assume that the giving of an instruction suggested

22  anything about the facts, and that the jurors were to "follow the instructions that do apply to

23  the facts as you find them." RT 1017; CT 407. The jury is presumed to have followed the

24  instructions and this is not a case where that presumption should be ignored. See Francis v.

25  Franklin, 471 U.S. 307, 324-25 n.9 (1985). In addition, the state court of appeal's

26  determination that CALCRIM No. 371 correctly states the law is binding on this court. See

27  Hicks, 485 U.S. at 629-30. Construing the instructions as a whole, there was no reasonable

28  likelihood that the jury misapplied CALCRIM No. 371 in a manner that lessened the

18

1   prosecution's burden of proof.  Accordingly, the state appellate court reasonably rejected

2   Petitioner's claim relating to CALCRIM No. 371.  Therefore, Petitioner is not entitled to

3   habeas relief on this claim.

4       **C.**    **ADMISSION OF THE SHOE LINEUP**

5           **1.**    **Background**

6         Prior to trial, Petitioner's trial counsel filed a motion in limine to exclude Sousa's

7   testimony relating to the identification of Petitioner's shoes—the Nike tennis shoes

8   retrieved from the back of Skucius's truck—as being similar to those worn by the suspect

9   in the first liquor store robbery.  CT 339-340.  After considering testimony from Detective

10  Shueh and argument of counsel, the trial court denied the motion in limine.  RT 328-350,

11  400.  The court observed that it had "some questions and concern with the constitutional

12  standards" being applied from cases dealing with identifications based upon suggestive

13  lineups of *potential suspects* with cases dealing with identifications of *physical objects*, and

14  it concluded that "the shoe identification procedure was not so impermissibly suggestive as

15  to give rise to a substantial likelihood of irreparable misidentification."  RT 400.

16        The state appellate court rejected Petitioner's due process challenge to Sousa's

17  identification of the Nike shoes in the lineup, stating:

18                Our research has disclosed no cases supporting
19  defendant's position that legal principles governing a challenge
    to a witness's identification of a suspect based upon an unduly
20  suggestive lineup extends to the identification of objects.
    Indeed, the only California cases of which we are aware are to
21  the contrary.  The Third District Court of Appeal, addressing a
    challenge to a witness's identification of the defendant's car,
22  concluded that "the identification of physical evidence by a
    witness is not suppressible under the Simmons rub[r]ic
23  [citation], upon the ground that the '. . . procedure was so
    impermissibly suggestive as to give rise to a very substantial
24  likelihood of irreparable misidentification.'  Instead, the
    trustworthiness of that identification testimony is to be tested,
25  like other evidence discovered during a criminal investigation,
    by cross-examination, impeachment and argument." (People v.
26  Edwards (1981) 126 Cal. App. 3d 447, 457 (Edwards), quoting
    Simmons, supra, 390 U.S. at p. 384.)  And in [People v.]
27  Carpenter . . . [(1997)] 15 Cal. 4th [312,] at page 369, the high
    court, citing Edwards, supra, 126 Cal. App. 3d at pages 456-
28  457, rejected a challenge to the trial court's refusal to conduct
    an evidentiary hearing concerning the reliability of a witness's

identification of the defendant's car, holding that the court had correctly "rul[ed] that, although at trial defendant could fully probe any suggestiveness in the identification process, it would go 'to the weight rather than the admissibility of the evidence.'" [FN 5] And the argument was similarly rejected by the Ninth Circuit Court of Appeals, where the court gave it "credit for creativity" (Johnson v. Sublett (9th Cir. 1995) 63 F.3d 926, 932), but concluded: "There is no authority holding that a defendant's due process right to reliable identification procedures extends beyond normal authenticity and identification procedures for physical evidence offered by the prosecution.  [Citation.]"  (Ibid.)

> We conclude, following Carpenter, supra, 15 Cal. 4th at page 369, and Edwards, supra, 126 Cal. App. 3d at pages 456 to 457, that the due process considerations involving suggestive lineups of potential suspects are not applicable to circumstances in which the police show witnesses inanimate objects such as vehicles or clothing.

[FN 5]: Other jurisdictions have similarly rejected claims that the identification of physical objects is subject to the same scrutiny as procedures under which suspects are identified through in-person or photographic lineups.  (See, e.g., Inge v. Procunier (4th Cir. 1985) 758 F.2d 1010, 1015 [truck], cert. denied, 474 U.S. 833 (1985); State v. Roscoe (Ariz. 1985) 145 Ariz. 212, 224 [700 P.2d 1312, 1324] [car]; Klase v. State (Del. 1975) 346 A.2d 160, 162 [knife]; Dee v. State (Ga. 2001) 545 S.E.2d 902 [gun]; Brooks v. State (Ind. 1990) 560 N.E.2d 49, 58 [handgun]; State v. Bruns (Iowa 1981) 304 N.W.2d 217 [car]; People v. Miller (Mich. Ct. App. 1995) 535 N.W.2d 518, 523 [car]; Hughes v. State (Miss. 1999) 735 So.2d 238, 261 [truck]; State v. Cyr (N.H. 1982) 453 A.2d 1315, 1317 [car]; State v. King (Wash. App. 1982) 639 P.2d 809, 811 [jacket].)

Harvey, 2011 WL 2039701, *7-8 (footnote and brackets in original, emphasis added).  In addition, the state appellate court noted that the manner in which Sousa identified the shoes was that she indicated they looked *similar to* those worn by the robber.  Harvey, 2011 WL 2039701, *10.  Nonetheless, the state appellate court acknowledged that the identification was still subject to challenge by Petitioner, but that any such challenge "bore on 'the *weight* rather than the admissibility of the evidence.'"  Id.

In his federal habeas petition, Petitioner claims that the trial court erred in allowing the testimony of Sousa because it was based upon a "prejudicially suggestive" shoe lineup in that (1) Petitioner's used, dirty shoes were compared with five pairs of new shoes; (2) the colors of the other five pairs of shoes were all different from that of Petitioner's shoes;

1   (3) Petitioner's shoes were shown against a beige background, while the other shoes were

2   shown against black backgrounds; and (4) Detective Shueh could not remember whether he

3   gave an admonition to Sousa before the lineup.  Dkt. 8 at 24-26.  Petitioner argues that the

4   shoe lineup procedure should be governed by the same standards that apply to photographic

5   lineups of potential suspects, and alleges that the error that resulted from the lineup was not

6   harmless.  Id.

7           **2.      Analysis**

8           "A conviction which rests on a mistaken identification is a gross miscarriage of

9   justice."  Stovall v. Denno, 388 U.S. 293, 297 (1967), overruled on another ground in

10  Griffith v. Kentucky, 479 U.S. 314 (1987).  When a witness identifies the defendant in a

11  police-organized photo lineup, due process requires suppression of eyewitness

12  identification only where "the photographic identification procedure was so impermissibly

13  suggestive as to give rise to a very substantial likelihood of irreparable misidentification."

14  Simmons v. United States, 390 U.S. 377, 384-85 (1968).

15          The claim presented in this action relates to a lineup involving a physical object, i.e.,

16  shoes.  Yet, Petitioner has not cited to—and the Court is unaware of any—clearly

17  established Supreme Court law that supports his position that lineups featuring physical

18  objects should be subject to the same standards as lineups featuring potential suspects;

19  therefore, his challenge to the state appellate court's rejection of his claim fails under

20  28 U.S.C. § 2254(d)(1).  See Carey v. Musladin, 549 U.S. 70, 77 (2006) (noting that if there

21  is no Supreme Court precedent that controls on the legal issue raised by a petitioner in state

22  court, the state court's decision cannot be contrary to, or an unreasonable application of,

23  clearly-established federal law.).  As the state appellate court pointed out, the Ninth Circuit

24  has acknowledged that there is *no authority* holding that Petitioner's due process right to

25  reliable identification procedures for such physical objects extends beyond "normal

26  authenticity and identification procedures."  See Johnson, 63 F.3d at 931-32 (no right to car

27  lineup pretrial identification procedures for identifying car).  Therefore, Petitioner's due

28  process claim fails for this reason alone, and he is not entitled to habeas relief.

1    Even if Petitioner had cited authority that clearly establishes the principle on which

2    he relies, his claim still fails because use of the allegedly suggestive shoe lineup was

3    harmless.  Petitioner argues that without the "wrongfully admitted shoe lineup and

4    testimony" by Sousa, the identity of the first liquor store robber would be "inconclusive at

5    best."  Dkt. 8 at 30.  This contention is unpersuasive.  Despite Petitioner's claim to the

6    contrary, the record shows that the jury was presented with other evidence that linked him

7    to the first liquor store robbery, including: (1) the pre-lineup description of the robber's

8    shoes that Sousa gave to police—i.e., the "blue and grayish" Nikes, RT 703; (2) People's

9    Exhibit 26—i.e., photos of Petitioner's shoes found in the parking lot of the hospital; and

10   (3) People's Exhibit 27—i.e., photos of enlarged view of robber's shoes from the store's

11   video surveillance system that captured the robbery.

12       In addition to her testimony about the shoe lineup, Sousa testified that she

13   recognized both People's Exhibits 26 and 27 as photos of the shoes the robber wore.  RT

14   515-516.  Because both exhibits were presented to the jury, there was no reason for the jury

15   to rely exclusively on Sousa's testimony because the jury could make its own assessment as

16   to whether the photo of Petitioner's shoes matched the photo of the shoes worn by the

17   robber.  Furthermore, the jury heard testimony that a Dodge Avenger was near both liquor

18   stores just before they were robbed, and there was evidence that the same kind of car could

19   have been used by Petitioner as the getaway car after the robberies.  RT 461-465, 475-476,

20   639, 662, 768, 770, 775, 840-844.  The jury also heard testimony that Petitioner's cell

21   phone use placed him near both liquor stores when they were robbed during the

22   approximately one-hour time span on April 21, 2008, and that he did not use his phone

23   during the exact times each robbery took place.  RT 558, 695-696, 880-885.

24       Finally, a review of the trial record indicates that the testimony based on the shoe

25   lineup was not heavily relied upon by the prosecution.  During closing argument, the

26   prosecution emphasized the scope of the evidence against Petitioner, and spent very little

27   time discussing the shoe lineup evidence.  RT 1034-35.  Instead, the prosecutor relied

28   mostly on a close comparison of the photo of Petitioner's shoes to the photo of the robber's

1  shoes captured by video surveillance system (People's Exhibits 26 and 27).  RT 1035.  And

2  on rebuttal, the prosecutor said nothing about the shoe lineup or Sousa's description of the

3  shoes at trial but argued instead that Petitioner's shoes matched the *description Sousa gave*

4  *the police after the robbery*.  RT 1085-1086.

5        Accordingly, the state appellate court's rejection of Petitioner's due process

6  challenge to the shoe lineup is not contrary to, or an unreasonable application of, clearly-

7  established federal law.  See 28 U.S.C. § 2254(d)(1).  Therefore, Petitioner is not entitled to

8  relief on this claim.

9  **IV.    CERTIFICATE OF APPEALABILITY**

10        No certificate of appealability is warranted in this case.  For the reasons set out

11  above, jurists of reason would not find this Court's denial of Petitioner's claims debatable

12  or wrong.  See Slack v. McDaniel, 529 U.S. 473, 484 (2000).  Petitioner may not appeal the

13  denial of a Certificate of Appealability in this Court but may seek a certificate from the

14  Ninth Circuit under Rule 22 of the Federal Rules of Appellate Procedure.  See Rule 11(a)

15  of the Rules Governing Section 2254 Cases.

16  **V.    CONCLUSION**

17        For the reasons stated above,

18        IT IS HEREBY ORDERED THAT:

19        1.    All claims from the Petition are DENIED, and a certificate of appealability

20  will not issue.  Petitioner may seek a certificate of appealability from the Ninth Circuit

21  Court of Appeals.

22        2.    The Clerk shall enter judgment, close the file, and terminate any pending

23  matters.

24        IT IS SO ORDERED.

25  Dated:  3/27/15                        *Saundra B Armstrong*
                                        SAUNDRA BROWN ARMSTRONG
26                                       United States District Judge

27

28